UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 1:15-cv- |
| FIVE MILLION DOLLARS ($5,000,000) IN UNITED STATES CURRENCY, | ) ) ) | |
| | ) | |
| | ) | |
| Defendant-in-rem. | ) | |
| | ) | |

VERIFIED COMPLAINT FOR FORFEITURE IN REM
FOR PROPERTY WITHIN THE UNITED STATES' POSSESSION, CUSTODY
OR CONTROL PURSUANT TO SUPPLEMENTAL RULE G

Plaintiff United States of America brings this complaint, in accord with Rule G(2) of the Supplemental Rules for Certain Admiralty and Maritime Claims, and alleges as follows:

NATURE OF THE ACTION

This is an action in rem to forfeit and condemn to the use and benefit of the United States of America the defendant in rem for violation of 18 U.S.C. § 1341, which is within the United States' possession, custody or control.

JURSIDICTION AND VENUE

The United States brings this action in rem in its own right to forfeit and condemn the defendant property under 18 U.S.C. § 1341. This Court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355. Venue is proper in this district pursuant to 28 U.S.C. §§ 1395 and 1355(b)(1)(A) and (B).

## THE DEFENDANT IN REM

The defendant in rem consists of the following property: Five million dollars ($5,000,000.00) in United States currency, which has been delivered to the United States.

## FACTS

1. From late 2006 until late 2011, Jonathan Neuman was the president of Imperial Holdings ("Imperial"), a specialty finance company headquartered in Boca Raton, Florida and incorporated under Florida law.

2. At all relevant times, Imperial's primary business activities involved providing premium financing for high value universal life insurance policies (typically exceeding one million dollars) purchased on the lives of individuals 65 years of age and older ("insureds"). As president, Neuman ran Imperial's premium finance business.

3. With respect to the premium finance business, Imperial normally issued loans to irrevocable life insurance trusts ("ILIT") for the purpose of paying premiums on the life insurance policies. The policy was owned by the ILIT for beneficiaries, who Imperial required to be family members of the insured.

4. Imperial loans typically matured in approximately two (2) years from the loan date, had interest rates averaging 11 percent and contained a substantial origination fee. During the loan term, the ILIT was not required to make any payments and therefore the interest accrued during the life of the loan. The collateral for the loan was the underlying life insurance policy.

5. If the insured passed away prior to loan maturity, the outstanding loan balance (including the accrued interest and origination fee) would be paid off in full, with the remaining proceeds from the life insurance policy going to the beneficiaries of the ILIT.

6.      Under the Imperial program, at loan maturity, the ILIT had several options: it could repay the loan and retain ownership of the policy; sell the policy into the secondary market and use the proceeds to pay off the loan; or default on the loan and relinquish ownership of the policy to a third-party that insured Imperial against the risk of loan default.  For the substantial majority of loans, the ILIT defaulted on the payment of the loan and relinquished ownership of the policy under the terms of the loan agreement.

7.      Pursuant to Imperial's business model, Imperial had the opportunity to make money at the beginning as well as the end of the loan transaction.  Life insurance carriers normally paid commissions to agents for placing life insurance policies.  As a condition to making premium finance loans on insurance policies, Imperial received agency fees from agents who wrote the underlying policies.  At the end of the loan transaction, Imperial also was paid a substantial origination fee and interest on the loan in addition to the outstanding principal.

8.       Imperial identified opportunities for making premium finance loans in multiple ways, but only one is pertinent to this Complaint.  Imperial employed individuals who were licensed life insurance agents ("Imperial internal life agents") contracted to write life insurance policies with various insurance carriers.  At Neuman's direction, these Imperial employees worked with external general agents and brokers ("deal sources") to apply for universal life insurance policies for individuals over 65 years of age from various insurance carriers which Imperial might finance under the loan terms described above.  Neuman called this line of business the retail non-seminar business.  The retail non-seminar business operated until January 2009.

9.      At Neuman's direction, Imperial employees operating the retail non-seminar business assisted prospective insureds and deal sources in completing life insurance applications

and submitting the applications to various life insurance companies. As part of the retail non-seminar business Imperial employees would mail life insurance applications.

10. At all relevant times, certain insurance companies required that a prospective insured, and sometimes the Imperial internal life agent, applying for a life insurance policy disclose information relating to premium financing on applications for life insurance policies. These questions typically required the prospective insured to disclose if he or she was using premium financing in connection with the policy.

11. In certain instances, Neuman knew that answering insurance application questions to indicate that the potential insured was not using premium financing to pay the premiums increased the likelihood that an insurance company would issue the policy. The issuance of a policy, in turn, offered Imperial the opportunity to make a premium finance loan and thereby make a profit.

12. It was therefore in Imperial's interest that these prospective insureds in the retail non-seminar business indicated on applications that they were not using premium financing to pay insurance premiums. However, in certain instances, such answers were false because the insureds were interested in a life insurance policy only on the condition that the premiums would be financed.

13. At Neuman's direction, in certain instances, Imperial internal life agents facilitated and/or made misrepresentations on insurance applications that the prospective insureds in the retail non-seminar business were not using premium financing to pay premiums when the insurance carrier was likely to deny the policy on the basis of premium financing.

14. Neuman profited from this fraudulent scheme by receiving compensation from Imperial in excess of $5,000,000.00. After a discussion with counsel for the government, during

which counsel for Neuman was given wire transfer instructions, counsel for Neuman advised in writing that he had arranged for a voluntary payment of the defendant in rem, $5,000,000, to be made to the United States Secret Service on December 30, 2015, and that an agreement has been reached to waive notification of this Complaint under Rule G(4) of the Supplemental Rules for Admiralty Or Maritime Claims And Asset Forfeiture Actions, as well as to allow the United States to move immediately for a Final Order of Forfeiture in this matter.

## CLAIM FOR FORFEITURE

15. The allegations contained in paragraphs 1 through 14 of this Verified Complaint for Forfeiture in Rem are hereby incorporated by reference.

16. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

17. Included in the definition of "specified unlawful activity," pursuant to 18 U.S.C. § 1956(c)(7) are offenses listed under 18 U.S.C. § 1961(1). One of those offenses is mail fraud, 18 U.S.C. § 1341.

18. The defendant in rem, five million dollars ($5,000,000.00) in United States currency, represents proceeds traceable to a violation of 18 U.S.C. § 1341.

19. As a result, the defendant in rem, five million dollars ($5,000,000.00) in United States currency, is liable to condemnation and forfeiture to the United States for its use, in accord with 18 U.S.C. § 981(a)(1)(C).

## RELIEF REQUESTED

20. Therefore, the United States requests that:

(a) the Clerk of Court issue a Warrant of Arrest in Rem, in the form submitted with this Verified Complaint, to the United States Marshal for the District of New Hampshire;

(b) judgment of forfeiture be entered against the defendant in rem;

(c) the defendant in rem be disposed of according to law; and

(d) this Court grant the United States whatever other relief to which it may be entitled.

December 31, 2015

Respectfully submitted,

DONALD FEITH
Acting United States Attorney

By: /s/ Seth R. Aframe
Seth R. Aframe, AUSA
MA Bar 643288
United States Attorney's Office
53 Pleasant Street
Concord, NH 03301
603-225-1552
seth.aframe@usdoj.gov

By: /s/ Arnold H. Huftalen
Arnold H. Huftalen, AUSA
NH Bar 1215
United States Attorney's Office
53 Pleasant Street
Concord, NH 03301
603-225-1552
arnold.huftalen@usdoj.gov

VERIFICATION

       I, Matthew K. O'Neill, being duly sworn, depose and say that I am a Special Agent with the United States Department of Homeland Security, United States Secret Service, and as such have responsibility for the within action, that I have read the contents of the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents therein, and that the same is true to the best of my knowledge, information and belief.

       The sources of my information and the grounds of my belief are official records and files of the United States, and information obtained by me and other law enforcement officers during an investigation of alleged violation of the laws of the United States.

                    /s/ Matthew K. O'Neill
                      Matthew K. O'Neill

STATE OF NEW HAMPSHIRE
COUNTY OF MERRIMACK

       Subscribed and sworn to before me this 31st day of December, 2015

                    /s/ Kimberly C. Cooper
                    Kimberly C. Cooper
                    Notary Public

My commission expires:  August 26, 2020